UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Brahim M Gaddour,                Case No. 23-22130-beh

                Debtor.          Chapter 7

## DECISION AND ORDER ON U.S. TRUSTEE'S
## MOTION TO DISMISS UNDER §§ 707(b)(3)(A) AND (B)

      The United States Trustee has moved to dismiss the Chapter 7 case of Brahim Gaddour for abuse, relying on sections 707(b)(3)(A) and (B) of the Bankruptcy Code. For the reasons set forth herein, the Court grants the motion based on a finding of bad faith, but denies relief to the extent the U.S. Trustee has failed to establish that the totality of the debtor's financial circumstances demonstrates abuse. The debtor will be given 14 days to file a motion to convert his case to Chapter 13. If no motion is filed, the case will be dismissed.

## JURISDICTION

      The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1334(a). A motion to dismiss under 11 U.S.C. § 707(b) is a core proceeding under 28 U.S.C. § 157(b)(2)(O).

## BACKGROUND

      This is the debtor's third bankruptcy case. He filed a Chapter 7 case in 2006, and later received a discharge. Eight years later, in 2014, Mr. Gaddour filed a Chapter 13 case. *In re Gaddour*, No. 14-21716 (Bankr. E.D. Wis.). In that case his mortgage lender objected to plan confirmation on the basis of bad faith. The court considered that a $250 monthly deduction to support the debtor's mother was reasonable. But the debtor's 401(k) contributions, catch-up payments and loan repayments, which exceeded $2,000/month, reflected bad faith toward creditors. The court reasoned that those payments were

"essentially payments to himself," and sustained the creditor's objection. *Id.* at ECF No. 28. The same creditor then objected to an amended plan, asserting that a retirement savings contribution of 12% of gross income was excessive, and pointed to other deductions as constituting bad faith. *Id.* at ECF Nos. 45 & 52. Ultimately the court confirmed a further amended plan which increased plan payments. *Id.* at ECF Nos. 55 & 69.

Mr. Gaddour filed the current Chapter 7 petition for relief in May 2023. His schedules list a non-filing spouse and two dependent young children. ECF No. 1, at 36–38. At the time of filing, Mr. Gaddour was 67 years old and owned a three-bedroom home in Mequon. His schedules estimated the home's fair market value at $413,250. Mr. Gaddour and his wife had purchased the home ten months earlier for $435,000,[1] after having rented a 900 sq. foot, two-bedroom apartment for $770/month. *See* ECF No. 1, at 9; ECF No. 42, at 2.

Mr. Gaddour has worked for almost 40 years for technology companies, most recently as a senior program manager. His Schedule I shows gross monthly wages of $10,737.56 and monthly social security payments of $3,408. ECF No. 1, at 36. His non-filing wife's monthly salary as an intern was $1,729.55. Mr. Gaddour listed a monthly contribution of $1,987.68 to a 401(k) plan,[2] and $289.12 in loan repayments to that plan. Notably, he listed the value of the 401(k) account with his employer as $0. ECF No. 1, at 24. He showed a net monthly income of $10,257.56.

On his Schedule J, Mr. Gaddour listed $135,427 in student loan debt,[3] and $350 per month in additional withholding for income taxes. ECF No. 1, at

---

[1] The debtor testified to purchasing new appliances and furniture for the home. He testified that due to his children's allergies he needed to remove the carpet and buy new flooring. Credit card statements offered into evidence by the U.S. Trustee showed all these items were paid by credit card, as were new closets and other furnishings.

[2] A review of the debtor's paystubs reveals slightly higher monthly contribution/catch-up payments to his 401(k) plan than listed on his Schedule J: he had $2,250 deducted monthly in 2022 (ECF No. 4, at 42), $2,146.80/month in 2023 (*id.* at 30–39), and contributed at that same rate in 2024 based on his paystubs for the first third of the year (ECF No. 59-2, at 1).

[3] The debtor testified that he guaranteed student loans for his wife, and still owed student loan payments for his son by a former marriage.

28–31 & 39. He listed a monthly food expense for the family of four as $1,200.00; $3,192.00 for childcare;[4] $790.00 for transportation;[5] $400.00 for entertainment; and $240.00 to assist his mother. *Id.* at 39. His monthly expenses totaled $10,980.79. *Id.* at 40. The debtor did not expect an increase or decrease in his expenses within the next year. *Id.*

Two weeks after Mr. Gaddour filed his bankruptcy case, the U.S. Trustee sought to obtain additional information about his debts, income and expenses as listed in his schedules. *See* ECF No. 24, at 1. On June 1, the debtor amended his Schedule E/F, with no change in the total of unsecured debt. ECF No. 10. On July 7, he again filed an amended Schedule E/F, as well as amended A/B, C, I and J. ECF No. 16. The debtor's amended Schedule I shows that his non-filing wife's gross monthly salary increased to $4,967.96 as a result of gaining full-time employment. ECF No. 16, at 28. His wife also makes a monthly voluntary Roth retirement contribution of $238.46. ECF No. 16, at 29; ECF No. 59-2, at 6.[6] The amended schedule shows a new monthly net income of $11,752.87. ECF No. 16, at 29.

Mr. Gaddour's amended Schedule J reflects an increase to $800 for additional tax withholding,[7] and $300 reserved for a (future) motor vehicle purchase. *Id.* at 31.[8] The new monthly expense total is $11,730.79. ECF No. 16, at 32. Form 122A-2, which a Chapter 7 debtor uses to perform the "means

---

[4] On his Form 122A-2 ("Chapter 7 Means Test Calculation"), the debtor listed a lower amount, $2,940.75, as his monthly childcare expense. The childcare expense shown on Schedule J is $250.00 higher than the amount reported on the means test. *See also* ECF Nos. 57-16 & 57-15, showing payments to Morningstar Montessori for $3,192 per month.

[5] The debtor said this $790 transportation amount included monthly gas expense and repair costs for his Ford Escape.

[6] The debtor's wife is in school fulltime to obtain a master's degree while working. The debtor estimates that she will owe $50,000-$60,000 in undergraduate and graduate student loans.

[7] The debtor testified that the $800 in additional tax withholding was due to his $24,000 gambling income in the first part of 2023. He did not amend his schedules to disclose that income.

[8] On his amended schedule the debtor noted that his 2007 Ford needs replacement or $4,800 in repairs. ECF No. 16, at 32. He later testified it was scrapped and admitted he no longer had the repair expenses.

test" calculation of section 707(b)(2)(A), shows that Mr. Gaddour's case is not presumed to be an abuse of Chapter 7. ECF No. 1, at 71. The U.S. Trustee has not contested the means test calculation and has not disputed that there is no presumption of abuse.

The debtor testified that his company has undertaken some recent layoffs, and he is concerned that he will be laid off if he does not voluntarily retire. He was offered "early" retirement but declined.[9] If the debtor's $3,408 monthly social security payments are included, the U.S. Trustee calculates that his current annual household income from wages and social security totals $229,362. *See* ECF No. 41, at 5.

Although not disclosed on his schedules, the debtor later admitted to receiving social security payments for his two children of at least $2,650 per month. His bank account statements reflect that those funds are deposited in his E*Trade account. *See* ECF No. 41, at 5; ECF No. 57-16; ECF No. 57-17.[10] If those payments are added to the household income, the total becomes $21,674 in monthly gross income, or $260,082 annually. *Id.*

The debtor and counsel for the U.S. Trustee stipulated to extend the deadline to file an action under 11 U.S.C. § 707(b) or 727. ECF No. 24. Thereafter, the Court granted the U.S. Trustee's renewed motion to extend the deadline. The U.S. Trustee sought to obtain copies of additional credit card statements—statements no longer maintained by the debtor—prior to determining whether to file a motion under §§ 707 or 727. ECF Nos. 33 & 38.

Mr. Gaddour's 2022 tax returns show $1,800 in income from gambling. ECF No. 57-17, at 5.[11] From June 2022 to July 2023, the debtor withdrew $51,695 from his bank accounts and seven credit card accounts to fund his

---

[9] The debtor testified that he has sent some emails as part of a search for a new job.

[10] The E*Trade statements submitted by the U.S. Trustee as Exhibit 16 are from 2022 and show a total of $2,352 in monthly social security deposits apparently on behalf of the two children. The monthly amounts may have increased in 2023, as the debtor did not dispute the $2,650 figure offered by the U.S. Trustee.

[11] The debtor testified to a gambling loss of approximately $7,000 in 2022, and a gambling loss of approximately $36,000 in the first quarter of 2023.

gambling activity. ECF No. 57-15, at 1.[12] Most of that activity—79 separate transactions—occurred between December 2022 and March 2023. The debtor eventually acknowledged a post-petition instance of gambling in July 2023 while on a business trip.[13] *See* ECF No. 57-13, at 9.

After some discovery pursuant to Federal Rule of Bankruptcy Procedure 2004, the U.S. Trustee filed a timely motion to dismiss Mr. Gaddour's case under 11 U.S.C. §§ 707(b)(3)(A) and (B). Additional discovery was taken, ECF No. 49, and the Court then held an evidentiary hearing at which the debtor and an auditor for the U.S. Trustee testified. After the conclusion of that hearing, the Court gave the parties time to submit their respective post-trial briefs in lieu of oral arguments.

## ARGUMENTS OF THE PARTIES

The U.S. Trustee has argued that the debtor made purchases without an ability to pay the related debt, that he made significant expenditures on the eve of filing his bankruptcy petition, and that he did not state his income and expenses accurately on his petition and schedules. For those reasons, the U.S. Trustee argues that the Chapter 7 filing was in bad faith. ECF No. 66, at 2–5.

As a second basis for dismissal, the U.S. Trustee argues that the totality of the debtor's financial circumstances not only reveals an ability to repay his creditors, but also that he did not file this case because of sudden illness, calamity, disability, or unemployment. Overlapping with the bad faith argument, the U.S. Trustee reasserts that the debtor made purchases beyond his ability to repay, his proposed family budget is excessive, and his statement of income and expenses is not accurate. ECF No. 66, at 5–7.

---

[12] The U.S. Trustee's Exhibit 15 is labeled Summary of Withdrawals: April 2022 through October 2023. ECF No. 57-15, at 1. But the individual withdrawals identified in Exhibit 15 are only from the period of June 2022 through July 2023. The correct total appears to be $51,695.

[13] The debtor scheduled gambling debt in his two prior bankruptcy cases. His 2006 schedules show $57,527 in gambling debt. Case No. 06-24129, ECF No. 1, at 4, 5, 16 & 25. In his 2014 filings, Mr. Gaddour asserted that he had ceased gambling. Case No. 14-21716, ECF No. 29. During that case he supplied copies of his 2011, 2012, and 2013 tax returns, each of which showed income and losses from gambling. *Id.* at ECF No. 29-1, at 6, 14, 16, 26; ECF No. 29-2, at 1.

Specifically, the U.S. Trustee contends that the debtor's annual household wage income exceeds the applicable $118,441 median income for a household of four by almost $70,000. *See* ECF No. 1, at 62. The U.S. Trustee also characterizes the debtor's monthly voluntary retirement contributions as a sham. He argues that in making the contributions, the debtor shields that income from creditors. Moreover, the U.S. Trustee argues, the 401(k) account balance of $0 demonstrates that the debtor actually is not saving those funds but uses them as disposable income. *See* ECF No. 41, at 6.

The U.S. Trustee notes that in the six months before filing this case, the debtor incurred $80,000 in unsecured consumer debt with almost three-quarters of that amount in bank withdrawals and credit cash advances to fund gambling. The U.S Trustee asserts that despite stable employment and an above-median household income, the debtor charged vacations, home improvements and furnishings and cash advances to his various credit cards. The debtor also gambled at least $50,000 in the twelve months before filing and continued to gamble post-petition. *See* ECF No. 41, at 1.

The U.S. Trustee characterizes a number of the debtor's monthly expenses as unreasonable. First, while Mr. Gaddour's monthly mortgage expense is $2,537.42, the applicable IRS mortgage expense for a household of four is $1,853. (In other words, the debtor is paying $683 more than the IRS figure). Second, the $3,192 in monthly childcare expense would shrink greatly if the $2,560 children's social security benefit was disclosed and considered. The U.S. Trustee also argues that there is no support in the debtor's pre-filing paystubs for his $800 monthly deduction to withhold additional tax. *See* ECF No. 41, at 6; ECF No. 4, at 30–50; *see also* ECF No. 59-2, at 1–3. The U.S. Trustee contends that the $400.00 monthly entertainment expense can be reduced. ECF No. 41, at 6.[14] According to the U.S. Trustee's math and suggested adjustments, the debtor should have available $2,115 in additional

---

[14] The debtor includes a $240/month payment to his elderly mother on his Schedule J, to which the U.S. Trustee does not object.

monthly disposable income, meaning he could repay creditors at least $126,900 over a 60-month plan. *Id.* at 6–7.

Mr. Gaddour disagrees. As to the bad faith allegations, he contends his continued employment is uncertain given recent layoffs at his company and his retirement-eligible age (68 at the time of the evidentiary hearing). He disputes that he has splurged by taking and charging the cost of "vacations." Instead, he made a trip to Tunisia several months before filing his petition to visit his homebound mother and to arrange for her care. *See* ECF No. 42, at 2. The other "vacation" was reserving a single weekend with his family at the Wisconsin Dells, for which he charged $700 to his Comenity Caesars Rewards card.[15] *See* ECF No. 41, at 8; ECF No. 57-12, at 6. Mr. Gaddour maintains that he used the funds in his 401(k) as a downpayment for the Mequon house and used credit cards to repair and furnish it. This practice does not "shield" his contributions from creditors, he says, but reflects that he is poor at tax planning and at the same time is trying responsibly to provide for his young family. Approximately three-quarters of the almost $80,000 in recent consumer debt arises from a gambling bout when, the debtor testified, he was dealing with a difficult personal circumstance.[16] To fund his gambling, he withdrew from bank accounts and took cash advances on multiple credit cards. For the first quarter of calendar year 2023, the debtor had a net loss of $36,825.09 from gambling at a local casino. ECF No. 59-1, at 1. By March 29, 2023, Mr. Gaddour had signed a self-exclusion agreement with that casino. *Id.* at 13. He urges that nothing in the Bankruptcy Code prohibits compulsive gamblers from receiving a discharge.

Responding to the U.S. Trustee's "totality of the circumstances" argument, Mr. Gaddour contends that under the means test he actually has a negative monthly disposable income between $1,757.40 and $1,932.33. ECF

---

[15] The debtor testified that ultimately the family didn't go to the waterpark because his children were sick, but there was no testimony that the $700 charge was refunded to the credit card account.

[16] The debtor described marital trouble as the circumstance which led him to despondency and gambling in December 2022 and the first quarter of 2023.

No. 42, at 5; ECF No. 67, at 9. The debtor's calculus excludes his $1,987.68 in monthly retirement contributions because, he asserts, that expense would be preserved in a Chapter 13 case. As he sees it, in a Chapter 13 case his existing car loan would be paid and he would need to finance another car, thereby creating another Schedule J expense. The family's second car recently was scrapped, and the debtor's current use of his employer's vehicle is limited to work purposes. ECF No. 42, at 5. The debtor projects that if forced into a Chapter 13 case, he would not be in that case long due to his anticipated lay-off, and a new Chapter 7 filing would result.

Yet a large part of the debtor's argument against both the section 707(b)(3)(A) and (B) allegations is to blame his creditors, and to contest the congressional policy behind Bankruptcy Code provisions. Specifically, the debtor argues that credit card companies tempt poor-credit consumers to take on further debt, usually at increasing interest rates. For example, he says, "credit limits were increased and sweetheart interest rates were offered, in order to encourage spending and to entice business away from other credit card accounts." ECF No. 67, at 4. His brief continues, "Mr. Gaddour also testified that, going into the end of 2022, most of his First National Bank of Omaha debt was incurred in response to offers of special rates on balance transfers." *Id.* at 5. He goes on:

> The reality is that none of the credit card vendors feel put upon by Debtor's bankruptcy filing. . . . They accepted a high-risk credit applicant. They knowingly took a risk, and they priced their product accordingly. . . . It is the US Trustee – representing an entity $34 trillion in debt – which has chosen, not to help problem gamblers and those with budgeting problems, but to act as the de facto collection agency for credit card companies who have not sought that help.

ECF No. 67, at 7.

## DISCUSSION

Even if a debtor's Chapter 7 filing does not trigger a presumption of abuse under section 707(b)(2)(A), as here, the U.S. Trustee still may request dismissal of the case, when (1) "the debtor filed the petition in bad faith," or

(2) "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) & (B); *see also In re Lorenca*, 422 B.R. 665, 674 (Bankr. N.D. Ill. 2010) (citing *Ross-Tousey v. Neary* (*In re Ross-Tousey*), 549 F.3d 1148, 1161–62 (7th Cir. 2008), *abrogated on other grounds*, *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61 (2011)). The movant has the burden to demonstrate by a preponderance of the evidence that the debtor filed his case in bad faith, § 707(b)(3)(A), or that a totality of his financial circumstances reveals an abuse of the bankruptcy system, § 707(b)(3)(B).

Each inquiry is fact-intensive, performed on a case-by-case basis. *In re Lowe,* 561 B.R. 688, 691 (Bankr. N.D. Ill. 2016). The Seventh Circuit described the criteria for deciding whether to dismiss a petition under section 707(b) as including "whether the debtors' income is high enough to enable them to repay a significant amount of debt without sacrificing a reasonable standard of living." *In re Schwartz*, 799 F.3d 760, 762–63 (7th Cir. 2015) (opting to address cause for dismissal under § 707(a)).

The Court considers the U.S. Trustee's bad faith allegation first.

A.    **Did the Debtor File His Case in Bad Faith?**

Courts will find bad faith in the commencement of a bankruptcy case if the debtor filed his case for a purpose not consistent with the Bankruptcy Code or policy, even though the purpose otherwise may be lawful. *In re Hageney*, 422 B.R. 254, 260 (Bankr. E.D. Wash. 2009). The Court should consider the debtor's conduct, including whether he made purchases without an ability to pay the related debt, whether he spent significantly on the eve of bankruptcy, whether he stated his income and expenses accurately, and any other misbehavior. *In re Booker*, 399 B.R. 662, 672 (Bankr. W.D. Mo. 2009). The Court examines each category of conduct below.

1.    **Pre-Filing Purchases and Ability to Pay**

Here, there is no dispute that Mr. Gaddour incurred significant debt in the months before he filed this case. Ten months before filing, he and his wife bought a new home, moving from an apartment and incurring a $413,000

mortgage. Bankruptcy courts have voiced differing perspectives on undertaking such a large debt shortly before filing for relief. One bankruptcy court, in *In re Crink*, 402 B.R. 159 (Bankr. M.D.N.C. 2009), viewed the debtors' housing expense to be excessive. Because those debtors had not been in their house long, the court reasoned there was no emotional attachment and that no equity could have built up in that short time. Moreover, the five-bedroom house in a prestigious neighborhood was more than the debtors' three-person household needed. IRS guidelines at the time showed housing costs of less than one-fourth of what the debtors spent on their home. *Crink*, 402 B.R. at 171–72. In contrast, another court, in *In re Lorenca*, recognized that a relatively new house payment would not always be evidence of bad faith, particularly considering closeness to school, jobs, and what rental options were available to the debtor. *See* 422 B.R. at 672–73*; see also In re Plichta*, 589 B.R. 794, 816–17 (Bankr. N.D. Ill. 2018) (finding creditor failed to show abuse where debtors had spent $40,000 in three months on mortgage payments and home repairs including mold remediation, but not on luxury improvements or new furniture).

Here, Mr. Gaddour testified that his family of four was outgrowing its small apartment and that a three-bedroom house would allow his children a safe neighborhood in which to play and later attend school. The U.S. Trustee did not dispute this testimony and instead relies on the cost differential to reflect unfair treatment of creditors. But that housing cost differential is not of the magnitude as existed in the *Crink* case. Mr. Gaddour's new mortgage is about 27% higher than the IRS housing standard; in *Crink*, the debtors' mortgage was approximately 75% higher than the standard. *See also In re Lorenca*, 422 B.R. at 674 (noting that debtors' monthly expense for a new home which was more than double the monthly housing expense under IRS guidelines did not, by itself, warrant dismissal for abuse; instead, maintaining a second residence was unfair to creditors). The Court finds that Mr. Gaddour's relatively new mortgage payment itself is not a sign of bad faith.

Mr. Gaddour's expenditures to update and furnish the new home are another matter. Instead of paying for those items with funds he had saved, or

spreading out those costs over time, the debtor used his Wells Fargo and Discover credit cards to update and furnish the home, at a cost of $10,749.31. *See* ECF No. 41, at 7–8; ECF No. 57-11, at 33 & 47; ECF No. 57-9, at 139. Seven months after incurring those expenses, the debtor filed this bankruptcy case. While it is not wrong to want to provide a modern, efficient home for one's family, it can be wrong for a debtor to pay for significant, discretionary expenses with unsecured debt instead of savings, and shortly thereafter seek to discharge those debts fully in bankruptcy. *See, e.g.*, *In re Merced*, No. 18-03837, 2020 WL 1943202, *6–8 (Bankr. D. P.R. Apr. 22, 2020) (finding as one factor of bad faith a debtor's use of loan proceeds to pay to furnish her new house following displacement by Hurricane Maria, instead of remaining in temporary housing and saving money for those expenses). Mr. Gaddour's credit card expenses to furnish and update his new home shortly before filing for bankruptcy are a factor tending to show bad faith in the commencement of the case.

### 2. Other Significant Spending on Eve of Bankruptcy

Although the U.S. Trustee asserts that Mr. Gaddour "took vacations" at the expense of his creditors, the single trip to his homeland to arrange care for his mother—a purpose the U.S. Trustee did not challenge—is not itself a sign of bad faith. In contrast, the planned family weekend at the waterpark, with $700 charged to a credit card, is more akin to the debtor's action in purchasing new home furnishings on credit instead of saving for the expense. And this weekend expense was incurred very shortly after the home furnishings were purchased, suggesting disregard of ability to pay. (Or, viewed in light of the debtor's scheduled $400/month in entertainment expense, a deliberate choice not to pay.) While not on its own a basis for dismissal under § 707(b)(3)(A), charging the waterpark expense shortly before filing for bankruptcy is another indicator of bad faith.

### 3.    Accuracy of Stated Income and Expenses

Misstatements and omissions on a debtor's schedules may be treated as evidence of bad faith if motivated by an improper purpose. *See In re Ricci*, 456 B.R. 89, 105–06 (Bankr. M.D. Fla. 2009). Mr. Gaddour failed to disclose on his original or amended Schedule I the $2,650 in social security payments he regularly receives on behalf of his two children and deposits into his E*trade account. *See, e.g.*, *In re Herrmann*, No. 10-06523-JW, 2011 WL 576753, at *5 (Bankr. D.S.C. Feb. 9, 2011) (explaining that § 521(a)(1)(B)(ii) requires a debtor to file his schedule of current income, and that § 521(a)(1)(B) does not exclude the listing of social security income). Mr. Gaddour acknowledged those funds only after inquiry by the U.S. Trustee. In addition, his late explanation at the hearing that he increased his tax withholding from $350 to $800 per month to reflect the tax consequence of $24,000 in unscheduled 2023 gambling income added further doubt to the completeness of the debtor's schedules. Without evidence of a proper purpose, these unjustified omissions and changes are material and support a finding of bad faith.

### 4.    Any Other Misbehavior

The U.S. Trustee argues that Mr. Gaddour's significant credit card and bank account withdrawals to fund his gambling are the kinds of misbehavior that warrant a bad faith finding. The U.S. Trustee points to gambling debts that Mr. Gaddour discharged in his first Chapter 7 case, and the subsequent years of gambling noted in his prior Chapter 13 case. The U.S. Trustee also points to the debtor's instance of gambling while on a business trip some four months after he filed this case. Mr. Gaddour, on the other hand, blames the credit card companies for making credit too easily available to him. He also blames his spate of gambling between December 2022 and March 2023 on marital trouble, to distinguish it from "luxury spending."

The Court does not view Mr. Gaddour's history of gambling as reflected in his 2007 and 2014 cases to be a determining factor here. But the magnitude of his most recent borrowing to gamble, without any manifest means to repay, suggests bad faith. Gambling may serve as a fleeting balm, but it is not on par

with, for example, necessary medical expenses. Consequently, the Court finds that the debt incurred to fund gambling in the months just prior to filing his case demonstrates bad faith.[17] Taken together, there is a preponderance of evidence that charging $11,000 in expenses to update his new home and to visit a waterpark, using credit cards and bank cash to gamble and thereby increase unsecured debt by more than $50,000, and failing to disclose the monthly social security payments received on behalf of his children support dismissing this case for bad faith under 11 U.S.C. § 707(b)(3)(A).

**B.    Abuse Under Totality of the Circumstances**

The Court next considers the U.S. Trustee's allegation that Mr. Gaddour's case should be dismissed under 11 U.S.C. § 707(b)(3)(B). This inquiry asks whether the totality of the circumstances of the debtor's financial situation demonstrates abuse. As noted recently in *In re Hozey*, 659 B.R. 337, 351 (Bankr. N.D. Ill. 2024), the Bankruptcy Code does not define the phrase "totality of the circumstances" and neither has the Seventh Circuit, at least for purposes of § 707(b)(3). Instead, courts have observed that the test "requires a more subjective, holistic assessment of the debtor and his circumstances." *Hozey*, 659 B.R. at 351 (internal citations omitted).

For this inquiry, courts assess more than the conditions at the time the debtor filed his case, and also weigh the factors which contributed to his filing of bankruptcy. Those factors may include any financial decisions he made around time he filed. *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991). Courts often look to see if sudden illness, calamity, or unemployment prompted the filing. *Id.*; *see also In re Deutscher*, 419 B.R. 42, 45 (N.D. Ill. 2009) (citing and applying *Green*). Courts may consider whether the debtor obtained cash

---

[17] Even though Mr. Gaddour asserted "nothing in the Bankruptcy Code prevents discharge of gambling debts," many courts have no trouble weighing such debts as part of a § 707(b) analysis. *See, e.g.*, *In re Vianese*, 192 B.R. 61, 71 (Bankr. N.D.N.Y. 1996) (In determining whether a debtor incurred cash advances and credit in excess of an ability to repay, "[g]ambling losses are to be looked at 'as an excess similar to other excesses associated with living beyond one's means. A debtor who finances excess gambling losses through the use of a credit card is no different from a debtor who uses a credit card to take a vacation or to make purchases he cannot afford.'").

advances in excess of his ability to repay, whether his day-to-day budget is unreasonable, and whether any statements made in his petition and schedules are untrue or inaccurate. *In re Kruse,* 545 B.R. 581, 589 (Bankr. W.D. Wis. 2016); *In re Lorenca*, 422 B.R. at 668–70.

### 1. **Future Ability to Pay**

Dismissal of a Chapter 7 case for abuse is intended to uphold the creditors' interest in obtaining repayment, in those instances where such repayment would not be a burden. *See In re Speith*, 427 B.R. 621, 624 (Bankr. N.D. Ohio 2009) (cautioning courts not to count repayment of 401(k) loan as allowable expense in absence of extenuating circumstances like poor health or pending retirement). This means a debtor's projected ability to repay creditors, were he in a Chapter 13 plan, should be weighed heavily, although merely some ability to repay is not the sole determinant. *See e.g.*, *In re Springirth*, No. 07-1437-AJM-7, 2008 WL 748138 (Bankr. S.D. Ind. Feb. 29, 2008); *In re Mravik*, 399 B.R. 202 (Bankr. E.D. Wis. 2008).

In assessing ability to repay, courts review whether the debtor has a stable source of future income, and whether his expenses can be reduced without depriving him or his household of adequate food, clothing, shelter and other necessities. *See In re Lowe*, 561 B.R. at 691; *In re Peterman*, No. 22-10296, 2022 WL 17824223 (Bankr. W.D. Wis. Dec. 20, 2022) (finding disposable income likely to decrease due to impending medical costs). Courts may consider whether certain current expenses will be increased or reduced in the future, *In re Crink*, 402 B.R. at 173, or whether the debtor needs to replace an ageing vehicle. *See, e.g.*, *In re Speith*, 427 B.R. at 625; *In re Horn*, No. 15-90240, 2016 WL 423781, at *4 (Bankr. S.D. Ind. Jan 4, 2016) (noting vehicle repairs and decreased work hours).

As for whether Mr. Gaddour has a stable source of future income, the evidence shows his continued substantial wage income is uncertain. The debtor's undisputed testimony is that his current employer asked him to take retirement (which Mr. Gaddour declined) and has laid off other employees in the months before the hearing in this matter. Little to no testimony was elicited

as to whether the debtor would be eligible for a buyout, or his ability to obtain part-time work, if needed. These circumstances, combined with the debtor's age, diminish the likelihood of him retaining full employment for the duration of a three- or five-year Chapter 13 plan, and weigh against dismissal under § 707(b)(3)(B). Losing employment would leave only social security payments as his continuing income, albeit his non-filing spouse has wage income which likely would be considered in a Chapter 13 case. *See Springirth*, 2008 WL 748138, at *2–3 (considering non-filing spouse's income in ability to pay analysis when it is substantial enough to cover or exceed household necessities).

Mr. Gaddour currently receives, and would continue to receive even if unemployed, monthly social security benefits. Social security payments typically are not countable for plan-payment purposes in a Chapter 13 case. Such funds are excluded from the definition of current monthly income. 11 U.S.C. § 101(10A)(B)(ii). Subject to § 1325(a)(3)'s good faith requirement, Chapter 13 debtors can opt not to use their social security income to pay unsecured creditors. *In re Brown*, No. 13-35593, 2014 WL 4793243, at *4 (Bankr. E.D. Wis. Sept. 14, 2014) (below-median debtor); *In re Uhlig*, 504 B.R. 916, 921 (Bankr. E.D. Wis. 2014) (above-median debtor).

But the U.S. Trustee contends that Mr. Gaddour's social security income may be considered in determining his ability to pay under a totality of the circumstances analysis. The U.S. Trustee cites *In re Meehean,* 611 B.R. 574, 585 (Bankr. E.D. Mich 2019), *aff'd* 619 B.R. 371 (E.D. Mich. 2020), for this proposition. There the court included social security income in its § 707(b)(3)(B) ability-to-pay analysis. To do so, the *Meehean* court contrasted the text of § 707(b)(2), which excludes consideration of social security income, with the text of § 707(b)(3)(B), which does not exclude that form of income. The *Meehean* analysis aligns with that of earlier decisions, including *In re Riggs*, 495 B.R. 704 (Bankr. W.D. Va. 2013). There the court held that in weighing whether to dismiss a Chapter 7 case as abusive based on the totality of the debtor's financial circumstances, a court may consider that the debtor is entitled to

receive social security benefits as part of that "totality." *See also In re Booker*, 399 B.R. at 667–68 (citing cases and concluding that social security funds should be considered in assessing a debtor's ability to pay).

Mr. Gaddour argues that to follow *Meehean* and consider social security payments as income available to pay creditors would be absurd, although he does not expressly confront the reasoning of *Meehean*. ECF No. 67, at 8–9. He simply relies on 11 U.S.C. § 101(10A)(B) to argue that social security funds are not part of current monthly income.

As even the *Meehean* court recognized, 611 B.R. at 582, bankruptcy courts are split on this question. For example, a recent decision expressly disagrees with the *Meehean* analysis. *See In re Hamilton*, 655 B.R. 911 (Bankr. S.D. Ohio 2024). In *Hamilton*, the U.S. Trustee argued that the social security income of the debtor's non-filing spouse should be considered when assessing ability to pay. In response, the debtor relied on § 407 of the Social Security Act to argue that the social security benefits were protected. The *Hamilton* court recognized a divergence of views but was persuaded that the broad protection of social security income under § 407(a) of the Act meant that the non-filing spouse's social security payments should be excluded from consideration of the debtor's ability to pay. 655 B.R. at 916.

Even in this district, the bankruptcy courts that have had the opportunity to consider the strictures of § 407 of the Social Security Act agree that social security income cannot be part of the calculus of funds available to pay creditors. *See In re Galesky*, 648 B.R. 643, 698 (Bankr. E.D. Wis. 2022); *In re Mravik*, 399 B.R. at 210. The *Galesky* court described:

> Galesky's income, when he filed his bankruptcy petition, consisted of disability benefits from the Social Security Administration and disability compensation from the Department of Veterans Affairs. . . . Such income is not only wholly exemptible from property of the estate in a bankruptcy case – assuming it is property of the estate in the first place – but broadly exempt under applicable non-bankruptcy law from the claims of most creditors in most (if not all) legal and equitable processes, including bankruptcy. 11 U.S.C. § 522(10(A) & (B); . . . 42 U.S.C. § 407(a) ("None of the moneys paid or payable or

rights existing under this subchapter"—i.e., title 42, chapter 7, subchapter 11, of the U.S. Code, which provides for the payment of federal disability insurance benefits as certified by the Commissioner of Social Security, among other things—"shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.").

*Galesky*, 648 B.R. at 698.

While this Court respects the view of *Meehean* and like courts, the Court must conclude that the text of 42 U.S.C. § 407(a) prevents making Mr. Gaddour's household social security income a contributor to his "ability to pay" in a § 707(b)(3)(B) analysis. If "ability to pay" were wholly retrospective, limited to the months before Mr. Gaddour filed his Chapter 7 case, the Court could agree that Mr. Gaddour *could have paid* more of his prepetition debt, particularly if the full $6,058 of household social security payments were viewed as part of income. But the caselaw is uniform at least in the respect that "ability to pay," as part of the totality of circumstances, considers what a Chapter 7 debtor might be able to pay if he were to convert and make payments under a Chapter 13 plan. In other words, it is a forward-looking analysis. *In re Lowe*, 561 B.R. at 691 (courts assessing ability to pay under § 707(b)(3)(B) look to a debtor's future income); *In re Crink*, 402 B.R. at 173 (courts assessing ability to pay under § 707(b)(3)(B) consider whether a debtor's future income may be decreased); *In re Herrmann*, 2011 WL 576753, at *5 (in a Chapter 13 case assessing good faith, consideration of projected disposable income is determined using a forward-looking approach).

Here, if Mr. Gaddour loses his full-time employment, his only income is from social security. That is not income this Court can assume to be, at this juncture, a source of Chapter 13 plan payments, though a Chapter 13 court nonetheless would consider the good faith basis of any proposed Chapter 13 plan. *See, e.g. In re Brown*, 2014 WL 4793243, at *4; *In re Uhlig*, 504 B.R. at 921; 11 U.S.C. § 1325(a)(3).

## 2. Reasonableness of the Debtor's Expenses

The next factor asks whether some of the debtor's expenses can be reduced. The U.S. Trustee points to the debtor's $400/month entertainment expense as ripe for reduction. Mr. Gaddour did not address the specifics of that outlay in his testimony or written argument. While generally a court should not superimpose its values and substitute its judgment for those of the debtor, *In re Roppo*, 442 B.R. 888, 894 (Bankr. N.D. Ill. 2010), the Court agrees that this expense can be reduced to $100/month. In contrast, the debtor's most recent amended budget lists a $300 monthly expense to save for the purchase of a replacement vehicle. The U.S. Trustee did not take issue with that outlay, nor will the Court. *See, e.g.*, *In re Scarafiotti*, 375 B.R. 618, 636 (Bankr. D. Colo. 2007) (permitting a comparable deduction).

Another expense worth scrutiny is the amount the debtor withholds from income for his retirement account. Currently Mr. Gaddour has $1,987.68 (or $2,146.80, *see supra* note 2) taken from his monthly paycheck and deposited in a 401(k) savings account. He also has a monthly deduction of $249 to repay a loan from his 401(k) account. The debtor urges that his retirement savings, like social security, cannot be counted as income in a Chapter 13 plan, citing *In re Mravik,* 399 B.R. at 211, and so should not be a factor in the § 707(b)(3)(B) analysis. Assuming he continues in full-time employment, the debtor's argument here is not persuasive.

First, the *Mravik* court concerned a debtor whose means test showed a presumption of abuse. The debtor had been paying into a retirement plan for 15 years. *Id.* at 204–05. The bankruptcy court reasoned that if the debtor converted to a Chapter 13 case, she would make no plan payments because the retirement payments would be excluded, and she was current on her secured debt (mortgage). *Id.* The U.S. Trustee alternatively sought dismissal of Mravik's case under the totality of the circumstances test. The court declined to dismiss on that ground, for the same reason that the debtor would not be required to pay into a plan the sums she had been deducting for retirement savings. *Id.* at 211. But the *Mravik* court noted that disallowing the expense of

retirement loan repayments could be appropriate, 399 B.R. at 210, and the debtor there had not manipulated income or expenses to qualify for a Chapter 7 discharge. *Id.* at 211.

Mr. Gaddour's circumstances differ from those of Ms. Mravik. His contributions, along with the loan repayment, total more than $2,200 each month. In his earlier Chapter 13 case, Judge McGarity found Mr. Gaddour's $2,000/month 401(k) contributions and loan repayments were not made in good faith. Accordingly, the court concluded that at least some of those funds should be directed to repay his creditors. *See* Case No. 14-21716, ECF No. 28, at 1.[18] *See also In re Burton,* 379 B.R. 732, 737 (Bankr. N.D. Ohio 2007); *In re Cutler,* No. 08-15568, 2009 WL 2044378, at *7 (Bankr. S.D. Ind. July 9, 2009) (analyzing ability to pay against "questionable self-serving expenses like repayments on loans from retirement plans").

The likelihood that in a Chapter 13 case at least a portion of Mr. Gaddour's retirement contributions, assuming his employment continued, would be deemed not made in good faith and thereby available for payment to creditors, is further supported by the fact that the debtor is not really saving those funds for retirement. Instead, the monies are deposited into his E*trade account, for use with ongoing expenses and purchases. Although the debtor amended his budget to increase his tax withholding from $350 to $800 monthly, that reserve (even if justified from a tax standpoint) does not make his 401(k) contributions any more "retirement-like."[19] Consequently, the Court finds that if the debtor continues in full-time employment, he has an ability to pay creditors a portion of his $2,200 monthly wage deduction ostensibly earmarked for his own retirement savings.

---

[18] *See Backus Elec. v. Hubbartt (In re Hubbartt),* Case No. 16-21251-beh, Adv. No. 16-02152, 2020 WL 1845041, at *1 (Bankr. E.D. Wis. Apr. 10, 2020) (court may take judicial notice of judicial proceedings) (citing *United States v. Doyle,* 121 F.3d 1078, 1088 (7th Cir. 1997)).

[19] The debtor's opposition brief asserts that he properly used his 401(k) monies as a down payment for the Mequon house. ECF No. 42, at 2. He certainly may have used retirement savings for the down payment, but he did not dispute that *after* his home purchase his 401(k) deductions routinely are transferred to his E*trade account.

### 3. Circumstances Preceding the Bankruptcy Petition

Mr. Gaddour does not contend that a sudden illness, disability, or unemployment necessitated his bankruptcy filing. Yet he does argue that those several months of fund withdrawals for gambling on the "eve of bankruptcy" constituted a precipitous event. The U.S. Trustee, on the other hand, views that conduct to be part of a pattern.

This Court cannot find that three or four months of gambling is a "calamity" that reasonably forced the debtor into a Chapter 7 bankruptcy. While the Bankruptcy Code does not define "calamity," and indeed § 707(b)(3)(B) doesn't use that term, it generally means a discrete, external event. The Merriam Webster online dictionary defines calamity as "a disastrous event marked by great loss and lasting distress and suffering, or a state of deep distress or misery caused by major misfortune or loss."[20] The exhibits offered by the U.S. Trustee demonstrate that Mr. Gaddour made 79 separate withdrawals to fund his pre-petition gambling and gambled on 30 separate days in that pre-petition period. ECF No. 57-15. Serial trips to the casino hardly can be called a discrete event. Even if the marital discord itself is considered calamitous, the record evidence supports only that the debtor's repeated credit card withdrawals to fund gambling at that time were volitional.

With no evidence of calamity, sudden illness, or disability to weigh, the Court next considers whether Mr. Gaddour was unemployed, or close to losing employment, at the time he filed this case. The undisputed testimony about company lay-offs, an invitation to take retirement, and his age have been discussed above. That testimony supports a finding that Mr. Gaddour's future employment is uncertain, at least for the duration of a Chapter 13 plan.

### 4. Cash Advances and Consumer Purchases Made in Excess of Ability to Repay

Mr. Gaddour contends that much of his credit card debt is merely accumulated interest at high rates, instead of the sum of multiple purchases.

---

[20] *Calamity*, Merriam-Webster (last updated Jan. 16, 2025), merriam-webster.com/dictionary/calamity.

As already described, the debtor also asks the Court not to hold him responsible for that debt, but to ascribe fault to credit card companies for extending credit to poor risk borrowers. The debtor also seems to blame the U.S. Trustee, or perhaps the U.S. Congress, for, in his view, not acting to aid persons with gambling problems and poor budgeting skills.

To the extent Mr. Gaddour argues that the Bankruptcy Code should reflect different policies, that is an argument best directed to lawmakers. "The Seventh Circuit has dispatched a clear message . . . that courts must not engage in judicial legislation, holding that a court of equity does not have 'free floating discretion to redistribute rights in accordance with its personal views of justice and fairness.'" *In re Nieves*, 246 B.R. 866, 872–73 (Bankr. E.D. Wis. 2000) (quoting *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co*, 791 F.2d 524 (7th Cir. 1986)).[21] Paying the minimum balance on credit cards while interest on those balances mounts is still debt for non-essentials incurred in excess of ability to repay.

## CONCLUSION AND ORDER

The U.S. Trustee has sustained his burden to show that Mr. Gaddour's Chapter 7 case should be dismissed as having been filed in bad faith under 11 U.S.C. § 707(b)(3)(A). While several of the financial actions critiqued by the U.S. Trustee were not unreasonable, the preponderance of the evidence shows that Mr. Gaddour filed inaccurate schedules which did not disclose social security

---

[21] *See also In re Fitzgerald*, 155 B.R. 711, 718 n.13 (Bankr. W.D. Tex. 1993) ("This is the Flip Wilson defense ('the devil made me do it'). The reason it is irrelevant is that our focus is not so much on how the debt was acquired, as it is on the debtor's ability and willingness to repay the debt. Credit card companies often create their own problems by inviting irresponsible use of credit, that is true. Congress easily could have addressed the resulting explosion in insupportable consumer debt by restricting the ability of credit card companies to collect on debt so irresponsibly invited. To date, however, it has not. Instead, Congress decided to approach the problem from the other direction, making it more difficult for consumers to escape paying the debt they incur. That is a legislative choice which cannot properly be invaded by the judiciary, though it can certainly be criticized.").

The *Fitzgerald* court expressed these thoughts in 1993; since then, Congress has made significant adjustments to the Bankruptcy Code via the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and the several CARES Act changes in 2020 and 2021 but otherwise it has not restricted the ability of credit card companies to collect debt.

income; he did not support his monthly expenses of $800 for tax payments and $400 for entertainment; at least a portion of his $2,200/month expense for retirement savings is not incurred in good faith; and in the several months before filing this case, he incurred significant credit card debt for home updates, multiple gambling outings, and a planned waterpark weekend without an ability to repay.

In contrast, the Court will deny the motion to dismiss under 11 U.S.C. § 707(b)(3)(B). While some factors evince Mr. Gaddour's ability to repay a portion of his debt—such as reducing his retirement savings contribution if he continues to work and reducing his tax withholding and his entertainment expense—the social security income he receives for himself and his children cannot be counted as part of his ability to pay. This exclusion becomes more critical to the analysis given the real uncertainty of Mr. Gaddour's continued fulltime employment.

Accordingly,

IT IS ORDERED that the motion of the U.S. Trustee to dismiss based on 11 U.S.C. § 707(b)(3)(A) is **GRANTED**.

IT IS FURTHER ORDERED that the U.S. Trustee's request to dismiss based on 11 U.S.C. § 707(b)(3)(B) is **DENIED**.

IT IS FURTHER ORDERED that Mr. Gaddour will have 14 days from the date of this order to convert his case to a Chapter 13 case, otherwise the case will be dismissed the following day.

Dated: January 28, 2025

By the Court:

Beth E. Hanan
United States Bankruptcy Judge